## OELRICHS *v.* SPAIN.

1. In the jurisprudence of the United States, the objection that there is an adequate remedy at law raises a jurisdictional question, and may be enforced by the court *sua sponte*, though not raised by the pleadings, nor suggested by counsel.

2. The equity jurisdiction will be sustained when time, expense, and multiplicity of suits will be saved, as also when the case contains an element of trust.

3. Securities to an injunction bond cannot go behind the decree to raise a question of illegality as to an agreement on which it is founded.

4. A release not under seal is not a technical bar, even in a suit at law. But even when sealed it cannot be set up in equity to defeat those who were not parties to it, and who had separate interests.

5. An injunction bond, given to one who held the legal title to a fund, will enable him at law to recover to the full extent damages touching the entire fund; and a court of equity will follow the law in its proper distribution.

6. Counsel fees are not recoverable on such bonds.

APPEAL from the Supreme Court for the District of Columbia, a court (as is said, *infra*, p. 219) of general jurisdiction, the case being thus:

On the 9th of November, 1842, the Bank of the United States was the owner of $500,000 of the bonds of the then independent Republic of Texas, a government, at that time, of bad pecuniary credit. Owing W. S. Wetmore $50,000, the bank assigned these bonds, with arrears of interest on them, to him as a *security* for the debt. In July, 1845, the Republic became one of the United States, under the name of the State of Texas, and immediately certain holders of its bonds became urgent that Congress should assume the payment of them, principal and interest. Among these holders was General James Hamilton, a person of some political influence in his day, and who had been instrumental in procuring the admission of Texas into the Union. As the Bank of the United States would gain largely if the United States did so assume the debt, Hamilton applied to its trustees— the bank having itself failed, and assigned its effects—urging them to employ him to have it done; and the trustees, in October, 1845, agreed with him that if he would devote his

"best efforts, time, and means to the great object of securing the recognition and payment of these claims," and if his efforts should be successful, they would allow him a commission of ten per cent. for the service so rendered. This agreement was limited, by its terms, to two years. However, Hamilton having labored successfully, this provision as to time was not insisted on. The trustees communicated the agreement fully to Wetmore, September 16th, 1850, without mentioning the original limitation, and directing him to "hold subject to the order of Hamilton, one-tenth of any sum over and above his claim against the said bonds." Wetmore acknowledged the receipt of this order, and promised to hold the bonds accordingly.

Through his, Hamilton's, efforts, largely, Congress, by an act of 9th September, 1850, did assume the payment of this debt, and authorized a five per cent. stock of the United States to be issued in lieu of the bonds of Texas; the act requiring, however, that before the stock of the United States should be issued, the holders of the Texas bonds should "first file at the Treasury of the United States, releases of all claims against the United States for said bonds."

The amount finally paid, June 3d, 1856, in behalf of the claim held by Wetmore, was . . . . . . . $817,720 88

Wetmore having paid himself his own debt, paid the residue of the nine-tenths to the trustees of the bank. This left in his hands, as trustee for Hamilton, the remaining one-tenth, or 81,772 08

A considerable time before this money was payable by the United States, Hamilton, who had long been pecuniarily embarrassed, directed Wetmore, by written orders, which Wetmore accepted, to pay out of it, when received,

| | |
|---|---:|
| To Wetmore, himself, . . . . . | $2,500 |
| To Corcoran & Riggs, . . . . . | 25,000 |
| To one Hill, . . . . . . . | 33,500 |

with interest from certain dates; so much being due by him, Hamilton, for money borrowed of these persons respectively.

It seemed to be admitted by all, as unquestionable, that the trustees of the Bank of the United States were, in virtue of some agreement of an admitted priority, entitled to receive of this . . . . . . . . . . . 81,772 08
The sum of . . . . . . . . . . 12,051 50

Leaving as Hamilton's true one-tenth, . . . . $69,720 58

In this state of things—and when if Wetmore had been allowed to distribute the one-tenth of Hamilton, or his one-tenth less the bank's last-named deduction, it would have paid Hill, as well as Wetmore and Corcoran & Riggs, all in full—one Spain filed a bill against Wetmore, Corcoran, & Riggs, and the trustees of the bank, *Hill not being by name made a defendant,* charging that Wetmore had the $81,772.08 as the property of Hamilton, and that he, Spain, had an assignment of the whole fund made by Hamilton at an early date. The bill then alleged that Wetmore, disregarding this earlier assignment, pretended to hold the fund, subject to certain other alleged assignments of later date; the bill specifying that to Wetmore himself, and those to Corcoran & Riggs, *Hill,* and the trustees of the bank—and alleging that Wetmore meant to apply the fund to the payment of these last " *said recited claims,*" and that the secretary was about to pay to Wetmore the said sum of $81,772.08. Asserting thus a superior equity, the bill then prayed: " *That the said Wetmore, his assignees, aiders, and abettors, may be enjoined and restrained from receiving the sum of $81,772, being the one-tenth of the three certificates,*" &c. Subpœnas were prayed against all these parties, and that the representative of *Hill* (Hill himself being now dead), should *be made defendant when discovered.* An injunction was granted " *as prayed for."* A bond, in the penalty of $15,000, signed by a certain *J. F. May* and *Henry May,* in favor of Wetmore, Corcoran & Riggs, and the trustees of the bank, but not by name in favor of *Hill,* was filed. The writ of injunction was issued on the 31*st* of *May,* 1856, directed to Wetmore, Hamilton, Corcoran & Riggs, and the trustees of the bank. It recited the filing of the bill and its object. The restraining clause was in these words:

"You, the said W. S. Wetmore, *your assignees, aiders, and abettors,* are hereby restrained and enjoined from asking for or receiving the sum of $81,772.08, being the one-tenth part of the bonds or certificates," &c.

This writ was served on Wetmore, and Corcoran & Riggs. From that time, until the dissolution of the injunction, here-

inafter mentioned, the money laid idle in the Treasury of the United States. Answers were filed by Wetmore, Corcoran & Riggs, the trustees of the bank, and by the representative of Hill.

*On motion of the defendants,* it was subsequently thus ordered:

"It appearing to the satisfaction of the court that there is *not sufficient security to indemnify the defendants for their costs and damages,* &c.; it is ordered that the complainant file a bond in the penalty of $20,000, conditioned to pay the *defendants* such costs and damages as they may *respectively sustain.*"

Prior to this the complainant had released his injunction as to the sum of $12,051, improperly enjoined, and this had been paid by Wetmore to the bank, and *a release of the injunction bond executed by the trustees of the bank. The form of that release did not appear in the record.*

The second bond, ordered as above-mentioned to be filed, was filed, executed by *Spain* and *Oelrichs.* This, *by consent of the parties,* was ordered to stand in lieu of the bond previously filed, reserving the right of the obligees to have recourse to the original bond for interest theretofore accrued. The obligees named in this bond were Wetmore, and Corcoran & Riggs, but not Hill by name. The bond recited the injunction issued by the court to restrain the collection of the money mentioned in the writ; it recited also that certain portions of the money so enjoined had been released and paid over. The condition was:

"That if the said Spain, &c., shall prosecute the writ of injunction to effect, and pay *as well the costs, damages, and charges that shall occur in said Circuit Court in Washington County, as all costs, damages, and charges that shall be occasioned by said writ of injunction,* and shall in all things obey such order and decree as the said court shall make in the premises, then the obligation to be void and of no effect, otherwise to remain in full force and effect."

The cause being heard it was decreed, on the 19th February, 1861, 4 years 8 months and 16 days after the injunction had issued—

1. That the legal title to the fund was from the 9th November, 1849, and still is in Wetmore.

2. That from the 16th September, 1850, when the trustees of the bank notified to him their arrangement with Hamilton, and he accepted it, Wetmore held the *legal title of the one-tenth as trustee of the fund.*

| | |
|---|---:|
| *First,* to pay himself, with interest, the loan of . . . | $2,500 |
| *Second,* to pay Corcoran & Riggs, . . . . . | 30,000 |
| *Third,* to pay Hill, with interest from 9th March, 1852, . | 33,500 |

From this decree Spain alone appealed. At the December Term, 1863, this court affirmed the decree with costs.*

Pending the appeal, there being no supersedeas and the decree having dissolved the injunction, the treasury paid to Wetmore, on 20th March, 1861, the sum remaining due on the one-tenth, $69,720.60.

There had been previously paid to the bank, the sum improperly enjoined, to wit: 30th March, 1859, the pro rata on $12,051.48.

The sum they paid to Wetmore was in three drafts, intended to represent the interests of the parties as settled by the decree, to wit:

| | |
|---|---:|
| For Wetmore, . . . . . . . . . | $4,333 89 |
| "  Corcoran, . . . . . . . . . | 30,000 69 |
| "  Hill, . . . . . . . . . | 35,386 00 |
| | $69,720 58 |

Wetmore and Corcoran & Riggs were paid in full; but on Hill's debt, as found by the decree, $52,457, there still remained unpaid $17,071.

Soon after the injunction was issued in this case, two others were issued on bills filed in the same court: one by the James River and Kanawha Company, and one by Pierce Butler. In the former an injunction bond was executed in the penalty of $5000, signed by Caperton and others; in the latter, one signed by Butler and others in the penalty of $2500.

---

* Spain *v.* Hamilton's Administrator, 1 Wallace, 604.

Butler's bill was heard with that of Spain, and subsequent to the decree in that case the James River and Kanawha Company dismissed their bill.

In both of *these* cases, the bonds expressly included among the obligees Hill's executor, as well as Wetmore and Corcoran & Riggs; while in the two bonds filed in Spain's case, as already said, neither Hill nor his executor was expressly named as obligee.

In this state of things the only child, heir, and legatee of Hill filed a bill to assert his father's claim for damages occasioned by these several injunction bonds. To aid in this, the representatives of Wetmore, as also the executor of Hill, were joined as complainants. The securities in the two bonds in the Spain case, May and Oelrichs, and the security in the bond in the James River Company's case, Caperton, were made defendants.

The bill was also filed against Corcoran & Riggs to seek a discovery from them as to whether any settlement had been made with them of the bond in the James River case.

It was also filed to marshal assets, and to assert the right of Hill to the whole of this latter bond, and compel Corcoran & Riggs to resort for payment to the *other* bonds, they being named as obligees in all, while Hill was named only in one—provided it should be decreed that the omission to name Hill specifically as obligee in the Spain bonds, prevented his looking to them for redress; a matter which was not conceded.

The bill also stated that Corcoran & Riggs has made some settlement of the $5000 bond, and prayed a discovery.

As to the bond for $2500 given by Butler, the complainant stated its payment by his representatives; and as to these representatives, the representatives of Henry May, one of Spain's securities, Spain himself, Ellis and Ould, parties to the James River bond, all non-residents and beyond the jurisdiction—the bill prayed that process might issue against them if they should come within the jurisdiction.

On this bill, answers, and proofs, the cause was tried and

decrees rendered asserting Hill's right to resort to the Spain bonds for redress of damages, and referring Corcoran & Riggs to the bonds on which they were named and Hill was not; and also allowing both Hill and them to recover counsel fees paid in attending to the injunction. The items thus appeared:

| | | |
|---|---|---|
| Corcoran & Riggs for damages, interest on the amount of their lien during the term payment was delayed by the injunction, a term of 4 years, 8 months, and 16 days, . . . . | $8,475 | 00 |
| Their counsel fees in the adverse litigation, . . . . | 1,000 | 00 |
| | $9,475 | 00 |
| Deduct the amount they received upon the bond given in behalf of the James River and Kanawha Company, . . . | 5,000 | 00 |
| Balance, . . . . . . . . . | $4,475 | 00 |

Of this sum, $2455.94 was charged on May's bond, and $2019.06 on Oelrichs's.

| | | |
|---|---|---|
| To Hill's estate for loss of principal by reason of the fact that part of the fund which would otherwise have been applied to it in part payment was absorbed for the interest due the prior claims, . . . . . . . . . | $827 | 41 |
| Interest on $36,214.35 for 4 years, 8 months, and 16 days, . | 10,230 | 55 |
| Counsel fees in the adverse litigation, . . .. . | 1,500 | 00 |
| | $12,557 | 96 |
| Deduct the amount received on the Butler bond, . . . | 2,500 | 00 |
| Balance, . . . . . . . . | $10,057 | 96 |

Of this sum there was charged to May's bond $5027.15, and to Oelrichs's, $5030.81.

May and Oelrichs now appealed, and the case was before this court for final adjudication.

*Messrs. T. T. Crittenden and T. J. Durant, for the appellants:*

1. The court is without jurisdiction of the action, since "a plain, adequate, and complete remedy could have been had at law," as well under the well-known 16th section of the Judiciary Act, as on settled rule independent of it. And the reason is plain. A suit on a bond against principals and sureties is, in its nature, a suit at the common law.

2. But if the court below had jurisdiction, the decree

rendered is erroneous. The decree is, in part, in favor of Hill's estate, but his administrator is not named in the bill as a defendant, nor in the order of injunction, nor in the writ of injunction, nor in the injunction bonds, and no injunction was asked against Hill's estate. In no way, under these facts, can the sureties on the injunction bonds be made liable to Hill's estate.

3. By the non-performance of his undertaking within the two years Hamilton was not entitled to receive or claim one-tenth part, or any portion of the fund; nor were Wetmore, or Corcoran & Riggs, or the representatives of Hill.

Further, the employment of Hamilton by the trustees of the bank, for a contingent compensation, was for the purpose of obtaining legislation to procure the payment of the claim of the trustees, and in doing so, to use personal and secret influence on legislators. For this reason, as well as by reason of champerty appearing on the face of the agreement, neither Hamilton nor his assignees could have maintained any action or title, or acquired any interest under or by virtue of the agreement.* The injunction bond, therefore, did not injure them.

4. The trustees of the Bank of the United States were joint obligees with Wetmore, Corcoran & Riggs. They released these injunction bonds, with consent of all parties. This, in law, releases the bond *in toto*, as the action, if maintained at all, must be in names of all the obligees in bond.

5. The act of Congress shows that Hill's administrator having omitted to file his release as required by law, neither he nor Wetmore could legally claim his share of the money during the pendency of Spain's bill, and in fact he obtained his money in 1861 by a blunder of the accounting officers, and wrongfully. There was nothing in the injunction, even if it had named him, to prevent his filing his release so as to be qualified to claim the money when the injunction was dissolved. His not filing it even then shows he was not prevented by the injunction.

---

* *Tool Company v. Norris*, 3 Wallace, 45.

6. The counsel fees were wrongly allowed. Such an allowance tends to lower the standard of professional honor, and has by the best courts been discouraged.*

*Messrs. P. Phillips, J. M. Carlisle, and J. D. McPherson, contra:*

I. As to jurisdiction. To oust the jurisdiction of equity, the remedy at law must be as " practical and as efficient to the ends of justice and its prompt administration, as the remedy in equity."† Now, here, it was surely the interest of the parties to the several bonds, to be brought together in one suit, where their relative rights could be determined, and thus save the necessity of another suit for contribution and apportionment.

On a promise under seal, a suit at law must be in the name of the party to the instrument. A third party, for whose benefit it was made, cannot maintain the action. It was, therefore, the undoubted right of Hill, as *cestui que trust,* to assert in a court of equity his equitable title in the bonds filed in Spain's case, without reference to the legal title in the trustee which might be enforced at law.

The Court of Chancery in the District of Columbia, where the bill below was filed, is a court of general jurisdiction,‡ and as to such a court nothing is intended to be out of its jurisdiction which is not shown to be so. It is requisite that the plea must not only show that equity has no jurisdiction, but what court has, and whether it is able to afford a complete remedy.

If Hill cannot recover on Spain's bonds, because not expressly named, then, as Corcoran & Riggs are named in all the bonds, and Hill only in one, equity will compel the former persons to indemnify themselves out of the bonds in which Hill is not named; and if they have already collected

---

* Day *v.* Woodworth, 13 Howard, 370; The Baltimore, 8 Wallace, 378; Stimpson *v.* The Railroads, 1 Wallace, Jr., 164; Gadsden *v.* Bank of Georgetown, 5 Richardson, 342.

† Boyce *v.* Grundy, 3 Peters, 215; Wylie *v.* Coxe, 15 Howard, 420.

‡ See Phillips's Practice, 283.

the amount of the James River bond in which Hill is named, equity will place him to this extent in their situation in reference to Spain's bonds.*

If neither Corcoran & Riggs nor Hill are entitled to recover on Spain's bonds, then, as against the same defendants, equity will prefer Hill's right to indemnity out of the James River bond, as they had received the full amount for which the court had decreed their lien, while a large amount decreed to Hill remained unpaid. Further, under any circumstances, Hill was entitled to an account against Corcoran & Riggs, and to a decree against them for such portion of the sum received by them from the James River bond as his claim bore to theirs.

Now, looking to the fact that each of the defendants in Spain's suit was entitled to make his election as to whether he would resort to the first bond, looking also to the several bonds and the various defendants, and to the character of the questions which they gave rise to, and which will be obvious to any intelligent lawyer on reading the case, it cannot be maintained that, if there was a remedy at law, it was as "practical and as efficient to the ends of justice and its prompt administration, as the remedy in equity."

Our position also is, that the bonds executed in favor of *Wetmore*, cover not only that portion of the fund in which he had a personal interest, but also the other portion which he held *in trust* for Corcoran & Riggs and Hill, that the bond was in fact a security attached *to the fund enjoined, and was made to him as trustee for these parties.* It is true that no *subpœna* was served on Hill, but the bill prayed that his representative, when discovered, should be made a party. On the face of the bill, Hill's interest is specifically stated. He was a necessary party to the suit. Before, as well as after filing his answer, he was bound to obey the injunction, though not served with process; and if he disobeyed, was liable to attachment. The bond, when filed, was for the

---

* Alston *v.* Munford, 1 Brockenbrough, 279; Cornish *v.* Willson, 6 Gill, 299; Cheesebrough *v.* Millard, 1 Johnson's Chancery, 412.

benefit of all the defendants enjoined, whether served or not.*

That these bonds were not intended as indemnity, merely for the personal claim of $2500, which Wetmore held, is manifest, because

1st. Spain describes the fund he wishes to enjoin, as amounting to the large sum of $81,000. At the same time he sets forth particularly the fact that Wetmore only claimed for himself the sum of $2500, and that the large remainder Wetmore professed to hold for Corcoran & Riggs and Hill. But he enjoins the whole sum.

2d. Having thus stated that much the larger portion of the fund belonged to other parties than Wetmore, the court could never have consented to enjoin the whole fund on a bond securing only the party who had the smallest interest therein.

3d. The order for the bond requires the bond to be " con- ditioned to pay the *defendants* such costs and damages as *they* may *respectively* sustain by reason of the injunction."

4th. When, therefore, the court approved the bond, and by *consent of the defendants* substituted it for the first, the court, as well as the defendants, must have understood it to be such a bond as the order directed to be given.

The prayer is for an injunction against Wetmore, "*his assignees, aiders, and abettors*," restraining *them* from asking for or receiving the sum of $81,000, and the writ which was issued on this prayer is to the same effect.

In another portion of the bill, the prayer is, " that the said Wetmore, and *all and each of the said named defendants, their assignees, aiders, and abettors, may be enjoined*," &c.

Now, construing the bonds in reference to this prayer, Hill is directly included; for Hamilton is one of the " said named defendants," and Hill is his " assignee."

This is certain, that Corcoran & Riggs and Hill were de- prived of the use of $69,720, less the small amount due to Wetmore, for five years, by reason of Spain's injunction

---

* Cumberland Co. *v.* Hoffman Co., 39 Barbour, 19.

operating on the whole fund. Practically, the injunction operated as directly on them as if they had been specifically named in the writ of injunction. The decree establishes that these parties were the owners of the fund when the injunction was issued. That in point of fact they have been greatly damnified, is not, and cannot be denied. The sole question is, have they in law any redress on these bonds for the wrongs thus inflicted? If they have not, it is not because they were not entitled to an indemnity, but because by accident, omission, or fraud, they have been deprived of it.

II. Then it is asserted that Hamilton had no interest in the fund, because his agreement with the bank was void as against the policy of the law, and it is thence inferred that no damage has accrued to any one by the injunction bonds. But it is not against this policy that one may agree to address the legislature by argument in favor of a certain measure. We need not, however, enter into this subject, for the objection is wholly misapplied. This is not an action to enforce the agreement, but one which relates solely to the disposition of money paid on such agreement.* Besides, if the question could have ever been made, it cannot be now, after the decree in the former case, where the bank and Spain were parties, and where the decree was based on the fact that Hamilton *did* own the fund. Oelrichs and May identified themselves with that litigation, and though not technically parties, are bound by the decree in it as much as if they had been named on the record.

III. It is next maintained that the release by the trustees of the bank discharged the bond as to those obligees who did not release. But this rule cannot apply to a case where the interest of the obligees is separate and distinct. No act of one under such circumstances could qualify, much less destroy, the rights of another. Even if the release had been by the present complainants, *equity* would not give it effect beyond the intention of the parties and the justice of the case.†

---

* Brooks *v.* Martin, 2 Wallace, 78.

† Clagett *v.* Salmon, 5 Gill & Johnson, 315.

IV. Again, it is urged that no loss of interest has accrued, because the claim was never presented in such a form as to authorize its payment by the treasury if no injunction had been granted. The bill of Spain prayed the injunction, on the averment " that the Secretary of the Treasury *is about to pay to said Wetmore the sum of* $81,772.08." The attempt is now made to controvert this sworn statement, and to prove that no payment could have been made, because neither Hamilton nor Hill had filed releases, as were required by the Secretary of the Treasury. If the law required this, the presumption is that the releases *have been filed;* the money has been paid. This presumption is not rebutted by the admission that these releases are not found in a certain file of papers in the department. The act requires releases from the "*holders of* the securities." Neither Hamilton nor Hill, his assignee, had any interest in the certificates. Hamilton had only a personal demand upon the bank for his commissions, when the sum of money was collected and paid over.

But, again : What necessity was there to file these releases after the injunction lodged in the department which forbade all parties from receiving the fund enjoined ? This payment could not take place until the injunction was dissolved and the interest of the several parties ascertained. When the decree was presented showing that neither Hamilton nor Hill had any interest in the certificates, and decreeing that *Wetmore was alone entitled to receive the whole sum* (if, in fact, no releases were filed), we can do no otherwise than conclude that the secretary considered such releases unnecessary, and therefore waived them.

V. As to counsel fees. Hill is entitled to include the counsel fees paid *in consequence of the injunction.* Whether counsel fees are recoverable in actions *ex contractu* is not the question. On this point the decisions are not harmonious. The claim here is founded on the *express terms of the obligation,* which is to pay " as well the costs, damages, and charges as shall occur in said Circuit Court, *as all costs, damages, and charges as shall be occasioned by said writ of injunction.*" These " costs, damages, and charges," superadded, are not

referable to the Circuit Court, for *they* are specifically provided for, and if they do not cover counsel fees they are meaningless. In *Edwards* v. *Bodine*,[*] the condition of the injunction bond was " to pay such *damages* as the parties may sustain by reason of the injunction." The court allowed the fees, saying:

"Here it is not matter of discretion—the condition is *imperative.*"

The same rule is applied to attachment bonds.[†]

Mr. Justice SWAYNE delivered the opinion of the court.

This litigation grows out of a prior suit, to which it is necessary briefly to advert in order to render intelligible the issues to be decided in the case before us.

The Bank of the United States assigned to William S. Wetmore certain bonds of the State of Texas as security for a debt which the bank owed him. He surrendered the bonds to the State and received in their stead certificates of indebtedness which he deposited in the Treasury of the United States for payment, under the act of Congress of the 9th of September, 1850, and the explanatory act of February 28th, 1855. The bank thereafter transferred one-tenth of the certificates, less the amount due to Wetmore, to General James Hamilton. Hamilton subsequently became indebted to Wetmore and gave Wetmore a lien upon his share of the fund to secure the payment of the debt and interest. He gave like liens to Corcoran & Riggs, to James Robb & Co., and to H. R. W. Hill. Robb & Co. transferred their claim to Hill. The trustees of the bank also claimed a part of the one-tenth as not embraced in the transfer to Hamilton. Before the fund was paid over by the Treasury Department, Albert C. Spain, as guardian of Mary McCrae, a lunatic, filed a bill in

---

[*] 11 Paige, 226; and see Aldrich *v.* Reynolds, 1 Barbour's Chancery, 616; Corcoran *v.* Judson, 24 New York, 107; Prader *v.* Grimm, 28 California, 12; Bronson *v.* Railroad, 2 Wallace, 283.

[†] Seay *v.* Greenwood, 21 Alabama, 496; Trapnall *v.* McAfee, 3 Metcalfe, 34.

equity, wherein he asserted a prior and paramount lien upon the fund in behalf of his ward, and prayed an injunction to prevent the defendants from receiving any part of the amount in question until the claim set up in the bill should have been passed upon by the court. To this bill Wetmore and the other claimants, except Hill, were made parties defendant. An injunction was granted as prayed for, and on the 31st of May, 1856, an injunction bond was executed. The penalty was $15,000. The obligees were Wetmore and the other defendants. The obligors were John F. and Henry May. The condition was that Spain " should prosecute the writ of injunction with effect and pay all damages and costs " which the obligees, " or any of them, shall sustain by the granting of this injunction." On the 23d of April, 1856, a further bond was given, pursuant to the order of the court, in the penal sum of twenty thousand dollars. The obligees were Wetmore and others. Hill was not one of them. The obligors were Spain and Oelrichs. The condition was that Spain should prosecute the writ of injunction " with effect and satisfy and pay as well the costs, damages, and charges which shall accrue in said Circuit Court of Washington County, as all costs, damages, and charges which shall be occasioned by said writ of injunction, unless the said court shall decree to the contrary."

By consent of parties it was thereupon ordered by the court that this bond should be filed in lieu of the prior bond, " reserving the right to the obligees to have recourse to the original bond for interest theretofore accrued, at the election of the obligees, and not otherwise."

On the 31st of May, 1856, the James River and Kanawha Company having filed a bill and procured a like injunction, gave bond in the sum of $5000. The obligees were Wetmore and all the other adverse claimants of the fund, including Spain and the executor of Hill. The obligors were Thomas H. Ellis, Hugh Caperton, and Robert Ould. The condition of the bond was that the company " shall well and truly prosecute the said suit with effect and shall answer all damages and costs which the defendants, or either of them,

may sustain by the granting of this injunction, in case it shall be dissolved." On the 20th of June, 1856, Pierce Butler procured a like injunction and gave bond in the sum of $2500. The obligees were Wetmore and the other claimants of the fund, including Hill's executor. The condition was that Butler should " pay and satisfy all costs and damages that may accrue to the obligees, or either of them, by reason of said injunction, in case the same shall be dissolved." In the progress of the cause, Spain dismissed his injunction as to the claim of the trustees of the bank for the sum of $12,051.50. That amount was paid to them, and they thereupon released their claim under the injunction bonds. By agreement of counsel the cases of Spain and Butler were heard together. The court decreed that there should be first paid to Wetmore the principal and interest of his debt, amounting together, including the cost of audit, to $4333.66. That there should be next paid to Corcoran & Riggs the amount of their lien, $30,000. And, thirdly, to the representatives of Hill the debt due to his estate, found to be then, with interest, $52,457.

The amount applicable to this demand, after satisfying the demands of Wetmore and Corcoran & Riggs, was $38,171. This left a balance due Hill's estate of $14,285.54 unsatisfied and unprovided for. The case was removed to this court by appeal, and the decree of the court below was here affirmed.* The James River and Kanawha Company dismissed their bill. Corcoran & Riggs subsequently collected upon the bond executed by Ellis, Caperton & Ould the sum of $5000. The penalty of the bond of Butler, $2500, was paid to the complainant, J. Dick Hill.

This bill is brought by the executors of Wetmore, the executor of H. R. W. Hill, and J. Dick Hill, his devisee and only heir-at-law, against John F. May, William W. Corcoran, George W. Riggs, Hugh Caperton, and Henry Oelrichs. It gives sufficient reasons for not making additional parties whose presence would otherwise be necessary, though not

---

* Spain *v.* Hamilton's Adm., 1 Wallace, 604.

indispensable, in this litigation. The object of the bill is to enforce in favor of Hill's estate the liability for damages arising under the injunction bonds, and if need be to marshal the assets. The executors of Wetmore claim nothing except in trust for the benefit of Hill's estate.

The court below allowed Corcoran & Riggs for damages, interest on the amount of their lien during the time payment was delayed by the injunction, being a period of four years eight months and sixteen days.

| | |
|---|---:|
| The interest, thus computed, makes the sum of . . | $8,475 00 |
| The court also allowed them for counsel fees in the adverse litigation, . . . . . . . | 1,000 00 |
| | $9,475 00 |
| From this was deducted the amount they received upon bond given in behalf of the James River and Kanawha Co., . . . . . . . | 5,000 00 |
| Balance, . . . . . . . . | $4,475 00 |

Of this sum, $2455.94 was apportioned to May's bond, and $2019.06 to Oelrichs's.

The damages awarded to Hill's estate were as follows:

| | |
|---|---:|
| Loss of principal by reason of the fact that part of the fund which would otherwise have been applied to it in part payment was absorbed for the interest upon the prior claims, . . . . . . | $827 41 |
| Interest on $36,214.35 for 4 yrs. 8 mos. 16 days, . . . | 10,230 55 |
| Counsel fees in the adverse litigation, . . . . | 1,500 00 |
| | $12,557 96 |
| Deduct the amount received on the Butler bond, . . | 2,500 00 |
| Balance, . . . . . . . . | $10,057 96 |

Of this sum there was appropriated to May's bond $5027.15, and to Oelrichs's, $5030.81.

May and Oelrichs appealed, and the case is now before this court for final adjudication.

It has been insisted by the counsel for the appellants that there is a complete remedy at law, and that the bill must, therefore, be dismissed. Such must be the consequence if the objection is well taken. In the jurisprudence of the

United States this objection is regarded as jurisdictional, and may be enforced by the court *suâ sponte,* though not raised by the pleadings nor suggested by counsel.*

The 16th section of the Judiciary Act of 1789 provides, "that suits in equity shall not be sustained in any case where plain, adequate, and complete remedy can be had at law;" but this is merely declaratory of the pre-existing rule, and does not apply where the remedy is not "plain, adequate, and complete;" or, in other words, "where it is not as practical and efficient to the ends of justice and to its prompt administration, as the remedy in equity."†

Where the remedy at law is of this character, the party seeking redress must pursue it. In such cases the adverse party has a constitutional right to a trial of the issues of fact by a jury.‡

But this principle has no application to the case before us. Upon looking into the record it is clear to our minds, not only that the remedy at law would not be as effectual as the remedy in equity, but we do not see that there is any effectual remedy at all at law. If the injunction bonds were sued upon at law, and judgments recovered, a proceeding in equity would still be necessary to settle the respective rights of the several obligees to the proceeds. The direct proceeding in equity will save time, expense, and a multiplicity of suits, and settle finally the rights of all concerned in one litigation. Besides, there is an element of trust in the case, which, wherever it exists, always confers jurisdiction in equity.

It has been urged that Hamilton's arrangement with the bank was illegal and void, and never fulfilled on his part, and that he had no title to the residuum of one-tenth of the certificates to which his assignment related. It is a sufficient answer to say that the trustees of the bank were parties to the former suit, and that the court recognized and affirmed

---

* Parker *v.* Winnipissiogee Company, 2 Black, 551; Graves *v.* Boston Company, 2 Cranch, 419; Fowle *v.* Lausdson, 5 Peters, 495; Dade *v.* Irwine, 2 Howard, 383.

† Boyce *v.* Grundy, 3 Peters, 215.    ‡ Hipp *v.* Baben, 19 Howard, 278.

the validity of the claim by administering the fund arising from it. The appellants cannot go behind the decree in the case in which their bonds were given. The law and the facts of that case, as settled by the court, are conclusive of their rights in this proceeding. They cannot be permitted to raise any question as to either.

The release given by the trustees of the bank cannot avail the defendants. If it were not by a sealed instrument, it would not be a technical bar even in a suit at law. In what form it was given is not disclosed in the record. But if it were properly executed under seal, it cannot in equity affect the severable and separate rights of parties to the bonds other than those by whom it was executed.

It is true that neither Hill nor his representatives were parties to either the bond of May or the bond of Oelrichs, and that they were not named in the writ of injunction issued upon the filing of the first bond. But Spain's bill averred that Wetmore held the fund in trust for Hill. Wetmore was an obligee in both bonds. The legal title to the entire fund was in him, and was never divested. It was extinguished by the payment of the money by the Treasury Department, and its distribution pursuant to the decree of the court. Wetmore during his lifetime, and after his death, his legal representatives, might have recovered upon the bonds at law to the full extent of the damages touching the entire fund. Such was his and their legal right. Equity would have distributed the proceeds, if need be, according to his rights and the equities of the other parties in interest. In this case equity follows the law as regards the liability of the appellants, and, having the proceeds in hand, will distribute them in this proceeding.*

The objection that proper releases were not filed in the Treasury Department is untenable. The proofs establish three facts:

The fund would have been paid over earlier but for the injunction.

* Livingston *v.* Moore, 7 Peters, 547; Riddle *v.* Mandeville, 5 Cranch, 322.

It was paid after the injunction was dissolved.

The delay caused by the injunction was the period for which interest was allowed by the court below.

Whether the payment was, or would have been, improperly made, is an inquiry which does not arise in this case, and with which the appellants have nothing to do.

It is sufficient for the purpose of this case that there was, in fact, such delay, and that it proceeded from the cause alleged in the bill.

The decree of the court below was preceded by the report of a master, which the decree affirmed and followed. Upon looking into the report we find it clear and able, and we are entirely satisfied with it, except in one particular. We think that both the master and the court erred in allowing counsel fees as a part of the damages covered by the bonds.

In *Arcambel* v. *Wiseman*,* decided by this court in 1796, it appeared "by an estimate of the damages upon which the decree was founded, and which was annexed to the record, that a charge of $1600 for counsel fees in the courts below had been allowed." This court held that it "ought not to have been allowed." The report is very brief. The nature of the case does not appear. It is the settled rule that counsel fees cannot be included in the damages to be recovered for the infringement of a patent.† They cannot be allowed to the gaining side in admiralty as incident to the judgment beyond the costs and fees allowed by the statute.‡

In actions of trespass where there are no circumstances of aggravation, only compensatory damages can be recovered, and they do not include the fees of counsel. The plaintiff is no more entitled to them, if he succeed, than is the defendant if the plaintiff be defeated. Why should a distinction be made between them? In certain actions *ex delicto* vindictive damages may be given by the jury. In regard to that class of cases this court has said: "It is true that

---

* 3 Dallas, 306.

† Tesse et al. *v.* Huntingdon et al., 23 Howard, 2; Whittemore *v.* Cutter, 1 Gallison, 429; Stimpson *v.* The Railroads, 1 Wallace, Jr., 164.

‡ The Baltimore, 8 Wallace, 378.

damages assessed by way of example may indirectly compensate the plaintiff for money expended in counsel fees, but the amount of these fees cannot be taken as the measure of punishment or a necessary element in its infliction."*

The point here in question has never been expressly decided by this court, but it is clearly within the reasoning of the case last referred to, and we think is substantially determined by that adjudication. In debt, covenant and assumpsit damages are recovered, but counsel fees are never included. So in equity cases, where there is no injunction bond, only the taxable costs are allowed to the complainants. The same rule is applied to the defendant, however unjust the litigation on the other side, and however large the *expensa litis* to which he may have been subjected. The parties in this respect are upon a footing of equality. There is no fixed standard by which the *honorarium* can be measured. Some counsel demand much more than others. Some clients are willing to pay more than others. More counsel may be employed than are necessary. When both client and counsel know that the fees are to be paid by the other party there is danger of abuse. A reference to a master, or an issue to a jury, might be necessary to ascertain the proper amount, and this grafted litigation might possibly be more animated and protracted than that in the original cause. It would be an office of some delicacy on the part of the court to scale down the charges, as might sometimes be necessary.

We think the principle of disallowance rests on a solid foundation, and that the opposite rule is forbidden by the analogies of the law and sound public policy.

The amount of the allowance in this case may be remitted here, as was done in the case in 3d Dallas, and the decree of the Circuit Court will thereupon be AFFIRMED. Otherwise the decree will be REVERSED, and the cause remanded for the reformation of the decree,

IN CONFORMITY TO THIS OPINION.

* Day v. Woodworth et al., 13 Howard, 370, 371.